UNITED STATES OF AMERICA

V.

UNICREDIT BANK AG

**FILED**

**APR 18 2019**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## ATTACHMENT A
### STATEMENT OF OFFENSE

This Statement of Offense is made pursuant to, and is part of, the Plea Agreements dated April 15, 2019, between the Money Laundering and Asset Recovery Section of the Criminal Division of the United States Department of Justice and the United States Attorney's Office for the District of Columbia (collectively "DOJ") and UniCredit Bank AG ("UCB AG"), and between the New York County District's Attorney Office ("DANY") and UCB AG. The parties stipulate that the allegations in Count One of DOJ's Information, the allegations in Counts One and Two of DANY's Information, and the following facts are true and correct, and that, had the matter gone to trial, the United States and New York State would have proved them beyond a reasonable doubt:

1.      Bayerische Hypo-und Vereinsbank AG, or simply HypoVereinsbank ("HVB"), as it is branded, is one of the largest banks in Germany. HVB is headquartered in Munich, Germany, and operates globally through a number of subsidiaries and branches, including a U.S. branch located in New York, New York. UniCredit SpA, an Italian bank headquartered in Milan, acquired 100 percent of HVB in 2005 and renamed it UCB AG. However, UCB AG continued to operate under its HVB brand name globally during the relevant period.

2.      Beginning in 2002, and up through and including 2011, UCB AG knowingly and willfully conspired to violate United States and New York State laws by processing U.S. dollar transactions through the United States on behalf of customers located or doing business in Iran and other countries subject to U.S. economic sanctions, causing financial services to be exported from the United States to Iran and elsewhere in violation of U.S. sanctions laws and regulations. UCB AG's conduct caused U.S. financial institutions located in New York, New York, to process U.S. dollar transactions that otherwise should have been rejected, blocked, or stopped for investigation pursuant to U.S. economic sanctions laws and regulations.

3.      One of UCB AG's Iranian customers during the relevant period was the Islamic Republic of Iran Shipping Lines ("IRISL").  On September 10, 2008, the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated IRISL and companies it controlled as specially designated nationals ("SDNs") under the Weapons of Mass Destruction Proliferators sanctions program ("NPWMD") due to IRISL's transport of cargo for weapons proliferators.  OFAC's designation of IRISL barred it and companies it controlled from the U.S. financial system.  UCB AG, knowing that IRISL was prohibited from accessing the U.S. financial system, conspired with IRISL to send funds through the United States for nearly two years after OFAC designated IRISL an NPWMD.

4.      As a result of this conduct, UCB AG processed transactions worth at least $393,536,632 through the U.S. financial system and institutions on behalf of UCB AG customers, including customers specially designated by the United States for assisting Iran's nuclear proliferation activities, in violation of U.S. sanctions.  The financial records underlying these transactions contained false entries or omitted truthful information in that the financial records did not accurately reflect the sanctioned connections of the parties involved.

## Applicable Law

5.      Pursuant to U.S. law, U.S. financial institutions are prohibited from participating in certain financial transactions involving persons, entities, and countries that are subject to U.S. economic sanctions ("Sanctioned Entities").  OFAC promulgates regulations to administer and enforce U.S. law governing economic sanctions, including regulations for sanctions related to specific countries, as well as sanctions related to SDNs.  OFAC designates certain individuals and entities as SDNs, blocking them and their assets from the U.S. financial system, among other things, because those individuals and entities are owned or controlled by, or acting for or on behalf

of, targeted countries, as well as individuals, groups, and entities, such as terrorists and weapons of mass destruction proliferators. Violators of OFAC regulations are subject to a range of penalties, both criminal and civil, and U.S. financial institutions, among others, are required to reject or block those transactions from proceeding.

*The International Emergency Economic Powers Act*

6.      The International Emergency Economic Powers Act, Title 50, United States Code, Sections 1701 to 1706 ("IEEPA"), grants the President of the United States a broad spectrum of powers necessary to "deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." Title 50, United States Code, Section 1701(a).

7.      The President exercised these IEEPA powers through Executive Orders that imposed economic sanctions to address particular emergencies and delegate IEEPA powers for the administration of those sanctions programs. On March 15, 1995, the President issued Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and declaring "a national emergency to deal with that threat." On May 6, 1995, the President issued Executive Order No. 12959, which imposed comprehensive trade and financial sanctions on Iran. These sanctions prohibited, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran or the Government of Iran of any goods, technology, or services from the United States or U.S. persons, wherever located. This includes persons in a third country with knowledge or reason to know that such goods, technology, or services are intended specifically for supply,

transshipment, or re-exportation, directly or indirectly, to Iran or the Government of Iran. On August 19, 1997, the President issued Executive Order No. 13059, consolidating and clarifying Executive Order Nos. 12957 and 12959 (collectively, the "Executive Orders"). The most recent continuation of this national emergency was executed on March 12, 2019. 84 Fed. Reg. 9219 (Mar. 13, 2019).

8.      The Executive Orders authorized the U.S. Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions and Regulations ("ITRs"),[1] 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders. With the exception of certain exempt transactions, the ITRs prohibited, among other things, the export of financial services to Iran, including prohibiting U.S. depository institutions from servicing Iranian accounts, and directly crediting or debiting Iranian accounts, without a license from the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"). 31 C.F.R. § 560.204. The ITRs defined "Iranian accounts" to include accounts of "persons who are ordinarily resident in Iran, except when such persons are not located in Iran" and explicitly prohibited the exportation of financial services performed on behalf of a person in Iran or where the benefit of such services was received in Iran. 31 C.F.R. §§ 560.320, 560.410. The ITRs also prohibited unlicensed transactions by any U.S. person who evades or avoids, has the purpose of evading or avoiding, or attempts to evade or avoid the restrictions imposed under the ITRs. The ITRs were in effect at all times relevant to the conduct described herein.

9.      OFAC was located in the District of Columbia.

---

[1] On October 22, 2012, OFAC renamed and reissued the ITRs as the Iranian Transactions and Sanctions Regulations. All of the conduct described herein took place prior to the renaming.

10.     Pursuant to Title 50, United States Code, Section 1705, it is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under IEEPA, including the ITRs.

11.     The unlawful transactions discussed below were not licensed or authorized by OFAC.

*New York State Law Regarding False Business Records*

12.     New York State Penal Law Sections 175.05 and 175.10 make it a crime to, "with intent to defraud,…1. [m]ake[] or cause[] a false entry in the business records of an enterprise [(defined as any company or corporation)]…or 4. [p]revent[] the making of a true entry or cause [] the omission thereof in the business records of an enterprise." It is a felony under Section 175.10 of the New York State Penal Law if a violation under Section 175.05 is committed and the person's or entity's "intent to defraud includes an intent to commit another crime or aid or conceal the commission thereof."

## DOJ Charge

13.     DOJ has alleged, and UCB AG accepts, that its conduct, as described herein, violated Title 18, United States Code, Section 371, by conspiring to violate IEEPA, specifically Title 50, United States Code, Section 1701 *et seq*, and to defraud the United States.

## DANY Charge

14.     DANY has alleged, and UCB AG accepts, that its conduct, as described herein, violated New York State Penal Law Sections 175.05 and 175.10.

## International Payments at UCB AG During the Relevant Period

15.     UCB AG is a member of the Society for Worldwide Interbank Financial Telecommunications ("SWIFT") and historically has used the SWIFT system to transmit

5

international payment messages to and from other financial institutions around the world. There are a variety of different SWIFT message formats, depending on the type of payment or transfer to be executed. For example, when a corporate or individual customer sends an international wire payment, the de facto message type is known as an MT103 SWIFT message. When a financial institution sends a bank-to-bank credit transfer the de facto standard is known as an MT202 SWIFT message. The different message types contain different fields of information to be completed by the sending party or institution. During the relevant period, some of these fields were mandatory— that is, they had to be completed for a payment to be processed—and others were optional.

16.     Transactions in U.S. dollars between two parties who maintain accounts at different banks located outside the United States typically must transit through the United States and U.S. correspondent banks through the assistance of SWIFT messages. This process typically is referred to as "clearing" through the United States.

17.     During the relevant time period, UCB AG typically processed and executed international U.S. dollar payments on behalf of customers in one of two ways. The first method, known as a "serial payment," was to send a single message, either an MT103 or 202, depending on the ordering party, which identified the originator and beneficiary of the U.S. dollar payment. The second method, known as a "cover payment," involved sending two separate SWIFT messages in connection with a single payment. One message—either an MT103 or MT202—identifying both the underlying originator and beneficiary of the payment was sent directly from the originator's bank to the beneficiary's bank, while a second message—an MT202—only identifying the bank originating the cover payment and the beneficiary's bank (but not the party originating the payment or the ultimate beneficiary) was sent through correspondent banks in the United States.

18.     During the relevant time period, cover payment messages did not require the sending bank to identify the party originating the payment or the ultimate beneficiary, whereas serial payment messages did.[2]  As a result, where the cover payment method was used, the U.S. banks did not receive adequate information needed to screen and potentially reject or block transactions involving sanctioned parties or countries.

### UCB AG's History of Doing Business Involving Sanctioned Jurisdictions

19.     UCB AG has done business in or involving countries subject to U.S. sanctions for several decades.  For example, as a result of strong trading ties between Germany and Iran, UCB AG opened a representative office in Tehran, Iran, in 1974 to support non-Iranian customers who engaged in business with Iranian parties, or on behalf of Iranian banks, corporations, and individuals.

20.     Beginning in the 1990s, UCB AG understood that increased U.S. sanctions on Iran would slow or stop its Iran-related transactions that cleared through the United States. UCB AG began to engage in various practices to avoid and evade the impact of U.S. sanctions, including overwriting sanctioned parties' names in SWIFT payment messages and omitting the names of sanctioned parties or countries from payment messages.  In a June 2002 internal email, the Head of the Middle East Department at UCB AG, who also ran the bank's representative office in Tehran, described the bank's historic practice for handling payments involving sanctioned Iranian banks:

> For your information: as you know, sanctions against Iran have been in place for some time.  This results among other things in difficulties for [U.S. dollar (USD)] payments in favor of Iranian beneficiaries.  It can/could happen that the payment to the USA was stopped or even frozen if an Iranian beneficiary was named or some other reference was made to Iran. In the past this was avoided by a kind of 'gentlemen's agreement' in such a

---

[2] MT202 payments did, however, contain optional fields in which the sending bank could include additional information about a payment or transaction.

way that the payment was made through the USA without any reference to the beneficiary.

21.   In 2000, UCB AG entered into a U.S. Dollar Clearing Agreement with a U.S. Bank ("U.S. Bank 1"), whereby UCB AG, among other things, agreed

> to ensure that no payment order will be for a purpose prohibited by the laws or regulations of the United States or the country of any other party to the transaction, or in violation of United States trade, currency control, foreign asset control, or other regulation or governmental order applicable to any UCB AG Group Member at the date thereof.

(the "U.S. Bank 1 Clearing Agreement").  The U.S. Bank 1 Clearing Agreement notified UCB AG that it could not clear U.S. dollar payments through U.S. Bank 1 that violated U.S. sanctions laws or regulations, and that all U.S. dollar payments cleared through U.S. Bank 1 had to comport with U.S. laws and regulations.  The U.S. Bank 1 Clearing Agreement remained in effect throughout the relevant time period and contributed significantly to the development of UCB AG's practices and policies for handling sanctioned business in non-transparent ways, including the ongoing practice of not referencing sanctioned countries or parties in any U.S. dollar payment.

### UCB AG's Policies and Procedures for Handling Sanctioned Business and Payments During the Relevant Period

*Sanctions Screening Generally*

22.   Financial institutions using the United States financial system are obligated to ensure they do not violate U.S. sanctions and other laws, and, as a result, screen financial transactions including international wire payments effected through the use of SWIFT messages. Because of the vast amount of wire payments processed by financial institutions in the United States, particularly those involved in correspondent banking, institutions often employ sophisticated computer software, commonly referred to as filters, to automatically screen all wire payments and messages against lists of sanctioned countries and parties, among other things.

When the filters detect a possible match to a sanctioned country or party, the payment can be stopped and held for further manual review.  When a financial institution determines that a transaction violates U.S. sanctions regulations, the institution must "reject" or "block" the payment—that is, refuse to process or execute the payment—and notify OFAC of the attempted transaction.  The sending institution must then demonstrate to OFAC that the payment does not violate U.S. sanctions before the funds can be released and the payment processed.

*UCB AG Initiated Project Embargo in 2002 and Rolled Out an Automated Sanctions Filtering Tool and Set of Procedures Codifying Pre-Existing Practices in 2004.*

23.     Prior to late 2004, UCB AG had no automated system at its non-U.S. branches for screening and monitoring international payments for compliance with domestic and foreign laws and regulations, including U.S. sanctions.  In July 2002, UCB AG initiated a project—known as Project Embargo—to create an automated payment and transaction filtering system.  The project was supervised by a Steering Committee appointed by the UCB AG Management Board, which included members of the Management Board, the General Secretariat of the Bank, several operating divisions, and the legal department.  The project lasted two years and culminated with the roll out of the bank's automated filtering tool in Munich—known as the Embargo Tool—in June 2004.   The Embargo Tool was not fully rolled out across all non-U.S. UCB AG branches until later in 2005.

24.     During Project Embargo, members of the team discussed OFAC regulations, their impact on the bank and its business, and procedures for handling "OFAC relevant transactions" once they were identified in the new system.  In particular, in February 2004, a consultant to the team prepared a draft presentation that identified an inherent conflict between "[m]aintaining lucrative business relationships and engaging in lucrative transactions with persons, organizations, banks and countries which are included in the OFAC sanctions list" and compliance with OFAC

regulations.  Although the consultant recommended that the resolution of the conflict was a "business policy decision" "to be submitted to the Executive Board," the investigation did not identify evidence that this recommendation was followed.

25.     In January 2004, prior to the roll out of the Embargo Tool, members of the embargo team discussed the Bank's current practices for handling "OFAC relevant transactions" and acknowledged that "US banks are forbidden from facilitating or assisting in financial transactions with persons/companies/institutions named on the OFAC list," and that "[b]y virtue of an agreement between the UCB AG Group and the clearer U.S. Bank 1, the UCB AG Group is obligated to comply with OFAC regulations."  Accordingly, the team noted that U.S. dollar payments violating U.S. sanctions should either be canceled or "neutralized"—a term with specific meaning at UCB AG, which was used to describe the process of omitting any reference to sanctioned parties or countries in SWIFT messages sent to U.S. banks.

26.     On February 19, 2004, there was a Project Embargo meeting regarding the "handling of OFAC cases," in which the attendees discussed, among other things: (1) the need to observe OFAC requirements pursuant to the U.S. Bank 1 Clearing Agreement; (2) the need to find a way to continue to handle profitable Iranian business; (3) that the OFAC issue was not new and procedures already existed to carry out certain types of transactions in an "OFAC-neutral manner"; and (4) that specific instructions needed to be  prepared for each product area for how to handle U.S. dollar business.  That same day, a member of the team sent an email in which he wrote, "[a] paper is being prepared as a basis for a decision to be taken by the management board of the Group, recommending that the contracting party be veiled if it appears on an OFAC list.  This should not be a problem for us – we are in any case already doing this with [Iranian Bank]."  In response, another member of the team wrote, "[a]s in the past, it must be ensured that the contracting party's

name is not mentioned in case of payments to or through US banks." In another email from February 2004, a team member wrote, "In the context of Project EMBARGO, rules need to be established for handling transactions which could become problematic from an OFAC perspective," and that, in the context of Iranian transactions and the procedures for handling them, "[u]ltimately, we are describing nothing more than the process as it has long since been carried out."

27.     On May 10, 2004, prior to the roll out of the Embargo Tool, the head of Project Embargo solicited informal advice from an attorney based in New York, who informed him that:

> As long as neither the US branch or other US entities or US individuals wherever located are involved it should not raise US sanctions problems under the so called OFAC sanctions (note that transfers of funds through the US if they were to occur in this connection may be required to be blocked and then held in place).

This advice confirmed what the bank already knew: with limited exceptions (including the then-applicable U-turn exception), payments involving sanctioned countries or parties could not be processed through the United States by any U.S. entity, including by U.S. correspondent banks processing UCB AG's transactions for Sanctioned Entities.

28.     When UCB AG rolled out the Embargo Tool in June 2004, an employee circulated a memo regarding "Observance of OFAC Rules for Documentary Foreign Payment Transactions and for Foreign Guarantees." The employee who circulated the memo noted in an email that "[t]he basic idea is that we describe the existing practice: OFAC relevant transactions are carried out, but only in an OFAC neutral manner. OFAC neutral can be: without the involvement of US banks or, if unavoidable, without showing the OFAC background."

29.     Following the Embargo Tool roll out in the summer of 2004, UCB AG created and circulated within the bank a 59-page procedural manual titled "Transactions affected by OFAC"

which included detailed instructions for how to handle various "OFAC relevant" transactions across business lines, including foreign payments, foreign exchange and money market transactions, and trade finance transactions. The introduction to the manual observed that all U.S. banks, regardless of location, must comply with OFAC regulations, and that no U.S. entity can become involved in "OFAC-affected" transactions. Further, it observed that, "[r]ecently, the requirements of sanctions administered by OFAC have been expanded significantly," and that "U.S. banks have perceptibly increased the pressure regarding adherence to sanctions." The manual made clear that UCB AG could not violate OFAC regulations, explaining that "UCB AG Group must observe OFAC's requirements" when dealing with U.S. banks.

30.     The manual additionally set forth detailed instructions for how various "transactions that are desired for business reasons can be executed in an OFAC-neutral manner" by the underlying business units and operational teams tasked with processing foreign payments and reviewing payments stopped in the new Embargo Tool filter, including through the use of the "cover payment" method whereby the SWIFT messages sent to the United States to fund U.S. dollar transactions contained no "OFAC-relevant" data. As the manual instructed, "[i]f the involvement of a U.S. bank cannot be avoided . . . care must be taken to ensure that the OFAC background of the transaction does not become apparent."

31.     Thus, with respect to payments and transactions implicating U.S. sanctions, the Embargo Tool, and the formal procedures for screening and executing U.S. dollar payments flagged in the tool, formalized UCB AG's prior ad hoc practice of concealing, falsifying, or omitting information related to sanctioned countries and parties from UCB AG's U.S. clearing banks. Among other things, this was done to ensure that lucrative business was not affected by payments being stopped or frozen in the U.S. due to sanctions laws and regulations.

32.     Numerous emails and other documents demonstrate that the UCB AG compliance team responsible for monitoring payments flagged by the Embargo Tool ensured that all "OFAC relevant" U.S. dollar payments were processed and executed in an "OFAC neutral" manner—i.e., by omitting any information related to a sanctioned country or party—consistent with the instructions contained in the manual.  For example, in September 2005, a member of the Project Embargo team sent an email explaining, "[t]here are procedures/operating guidelines specifying how desired transactions with OFAC contents can be executed – OFAC-neutral," and stressed that "[t]he most important fact is that no US bank can see OFAC contents in any MT [SWIFT message]."  Similarly, on or about September 6, 2005, the head of Project Embargo wrote to an attorney in the legal department, "[a] transaction is, in principle, of relevance with respect to OFAC if it involves data contained in the OFAC list (e.g., as principal, recipient, intended use).  This OFAC data may not be shown/indirectly disclosed to any **US bank**."  (Emphasis in original.)  The email continued, "[t]here are procedures/instructions on how desired transactions can be carried out in an OFAC neutral manner," then it provided a detailed example of how an Iranian-related payment should be split into two SWIFT messages, with an MT103 message being sent directly to the beneficiary's foreign bank, containing complete information about the underlying parties to the transaction, including the beneficiary entity in Iran, and a second MT202 message being sent to U.S. Bank 1 in the U.S. with "no contents relating to IRAN."  Instructions and emails of this type continued throughout the relevant period.

*The UCB AG Legal Department Solicited Advice from a U.S. Law Firm, But Failed to Inform the Law Firm That It Cleared Potentially Sanctioned U.S. Dollar Transactions through the United States*

33.     In April 2005, in response to concerns raised both internally and by an outside party, the UCB AG legal department solicited an opinion from a law firm in New York on the

extraterritorial effect of U.S. laws, particularly related to business with Iran. The American law firm advised that, with respect to transactions with Iran, "UCB AG Munich is not a 'person that is subject to the jurisdiction of the United States,'" particularly "because the transactions [described by UCB AG] would clear outside the United States" such that "there would be no argument that as a result of the clearing process, a U.S. person was transferring blocked funds as a result of the clearing process." The firm's opinion was critically flawed, however, because UCB AG provided erroneous and incomplete information regarding how it processed OFAC relevant U.S. dollar transactions. UCB AG, in fact, was clearing transactions with Iran through the United States and had specific, memorialized procedures, outlined above, designed to ensure that such transactions were not detected by banks in the United States.

*Beginning in 2006, the UCB AG Legal and Compliance Departments Began Raising Concerns About the Bank's Sanctioned Business and Payment Practices.*

34.     Beginning in 2006, the legal and compliance departments within UCB AG started raising concerns internally about "disguising" and "veiling" information in U.S. dollar transactions cleared through the United States. However, those concerns did not translate into changes in official policies or procedures, and the compliance team responsible for reviewing payments flagged in the Embargo Tool continued to give instructions not to mention Iranian customers in U.S. dollar payment messages, but instead to format them in an "OFAC neutral" manner, omitting critical sanctions information from messages to U.S. banks.

35.     In August 2008, a member of the compliance team with responsibility for sanctions compliance sent an email to the Head of Credit Risk Management at UCB AG, stating that:

> we request another presentation be made to the [Credit Risk Committee] from the perspective of the [Sanctions Compliance Team]. This relates to the US dollar balances of Iranian customers with [UCB AG]:

14

> As of July 15, 2008, various Iranian customers (individuals and companies as well as banks) maintain US dollar balances in the amount of USD 37,398,604.88.
>
> From several points of view, we consider this to be problematic.
>
> - Current US sanctions against Iran . . .
> - Excerpt from the Clearing Agreement with [U.S. Bank 1] . . .
>
> Our recommendation is now to the effect of taking action to give notice to such customers to close out their USD balances or convert them to other currencies.
>
> . . .
>
> This should also be extended to all customers domiciled in a country sanctioned by OFAC (e.g., Cuba, Sudan, Myanmar-Burma, etc.).

A year-and-a-half later, in February 2010, the same compliance officer sent an email to other senior employees triggered by a complaint about difficulties in effectuating Euro payments on behalf of Iranian customers, in which he expressed his growing frustration:

> The Sanctions Team made various attempts in recent years to approach the Management Board of UCB AG to discontinue the Iran business. However, it was decided to continue the business . . . . New customers who open accounts with us in order to handle their payments . . . are evidently welcome anytime.

*UCB AG's Non-Transparent Payment Practices Resulted in at least $393,536,632 in OFAC Violations Between 2002 and 2011.*

36.     Between 2002 and 2011, UCB AG's practice of omitting sanctions relevant information from MT103 messages and using the MT202 cover payment method for transactions involving sanctioned countries or parties prevented U.S. banks from being able to screen payment messages, ensuring that such payments could not be stopped for further review by the banks' filters, and be either rejected or blocked.  As a direct result of these non-transparent payment processes, designed specifically to avoid detection by U.S. banks, UCB AG caused banks in the United States to process approximately $5,440,000,000 in payments involving sanctioned

countries or parties without providing sufficient information such that the U.S. financial institution could review the originator or beneficiary of the payment, and $393,536,632 in transactions in direct and willful violation of U.S. sanctions as a result of its conspiracy to violate U.S. sanctions, including its conspiracy with IRISL.

### The Islamic Republic of Iran Shipping Lines

*UCB AG Established a Relationship with the Islamic Republic of Iran Shipping Lines at a Time When Other European Banks Were Exiting Their Relationships with the Company.*

37.     In 2004, the year UCB AG rolled out its Embargo Tool and corresponding policy manual for handling "OFAC relevant" payments, UCB AG established a customer relationship with the Islamic Republic of Iran Shipping Lines ("IRISL"), the state-sponsored shipping line of Iran.  One of the largest shipping lines in the world, IRISL operated globally through a network of subsidiaries, affiliates, and agents.  Over the next several years, and during the relevant period, UCB AG opened 179 commercial bank accounts, including 62 USD accounts, for 55 IRISL-related entities.

38.     On September 10, 2008, OFAC designated IRISL, as well as several companies in the IRISL network and many IRISL vessels, as SDNs.  Specifically, the IRISL entities were designated as NPWMDs.[3]

39.     During the relevant period, from 2004 to 2010, IRISL, and companies UCB AG knew IRISL controlled, used accounts held at UCB AG's Hamburg branch to access the U.S. financial system in violation of U.S. sanctions laws. Notably, UCB AG knowingly processed transactions through the United States on behalf of IRISL-controlled companies for nearly two years after OFAC designated IRISL as an NPWMD in 2008, in violation of U.S. sanctions.

---

[3] IRISL was removed from the SDN list in January 2016 as part of the Joint Comprehensive Plan of Action.  IRISL was placed back on the SDN list in November 2018.

*Beginning in 2006 UCB AG Set Up a Series of Accounts for IRISL So That IRISL Could Send and Receive USD Payments through the United States Without Detection*

40.     In June 2006, an UCB AG relationship manager ("RM") for IRISL sent an email to an IRISL official confirming that UCB AG had opened several U.S. dollar accounts in the name of two wholly-owned subsidiaries of IRISL, including Company 1.  The accounts included "Auto-Dispo" services, whereby payments to the "source" account (e.g., Company 1's U.S. dollar account—referred to by IRISL as a "safe account") automatically would be transferred on a book-entry basis to a "target" account held by IRISL at UCB AG.  In other words, IRISL could send and receive U.S. dollar payments using the Company 1 account, without U.S. financial institutions knowing that IRISL was behind the Company 1 payments.  The UCB AG RM for IRISL noted in 2006 that, "[i]n response to your enquiry concerning the data-transfer of payments in USD across the [U.S. Bank 1] to banks in foreign countries, we like to inform you, that in the most cases, the data of the payment will be send [sic] coded to [U.S. Bank 1].  We request you as a precaution, to co-ordinate according payments with us in advance."  Later, in response to an IRISL request to "arrange for transfer of all incoming and outgoing amounts one by one to main account" from the Company 1 U.S. dollar account, another UCB AG RM for IRISL clarified, "[i]f we get it straight, you like to have every single payment which is debited or credited to . . . Company 1 also a single transfer to your source account."

41.     The establishment of these so-called "safe accounts" was done in the larger context of UCB AG's "desire for a closer relationship with the customer [IRISL]" and IRISL's intent to "expand our mutual business" beginning in the latter part of 2006, a time when other European financial institutions were exiting, or had already exited, their U.S. dollar relationships with IRISL.

42.     At about the same time, a UCB AG RM for IRISL drafted internal instructions to handle IRISL payments in the "normal way" to "ensure" that information was "not transmitted to

[U.S. Bank 1]" —i.e., by splitting the payment into two SWIFT messages and ensuring that the

beneficiary of the payment (IRISL) not be included in any message sent to U.S. Bank 1, consistent

with the practices in place at the time under the Embargo Tool policy manual. Similarly, nearly

two years later, in June 2008, the UCB AG correspondent banking relationship manager for the

Middle East region confirmed in an email to the UniCredit Group head of correspondent banking

in Milan that UCB AG processed U.S. dollar payments on behalf of IRISL in this manner, ensuring

that in the MT202 message sent through the United States, "there is no relationship to Iran."

*On the Eve of Being Designated as an NPWMDs by OFAC in 2008, IRISL's UK Office Opened a
USD Account at UCB AG under the Name of Company 2*

43.     On June 20, 2008, a UCB AG RM for IRISL sent an email to an official at IRISL's

regional branch office in the United Kingdom, informing him that a payment for IRISL's UK

branch had been stopped and returned based on sanctions against Iran. Ten days later, the same

IRISL UK official sent the UCB AG RM for IRISL an email informing him that the head of

IRISL's UK branch had set up a new company ("Company 2") and wanted to open an account in

the name of Company 2 at UCB AG. UCB AG opened the account the next day. In the account

opening documents, IRISL's UK branch was given power of attorney over the Company 2 account;

the address for Company 2 was listed as the same address as IRISL's UK branch; and the head of

IRISL's UK branch was the signatory on the account.

*After IRISL and Several Related Entities Were Designated NPWMDs by OFAC on September 10,
2008, UCB AG Continued to Process USD Payments on Behalf of IRISL and Known IRISL
Entities, Including Company 1 and Company 2.*

44.     On September 10, 2008, OFAC placed IRISL, several IRISL related entities,

including IRISL's UK branch and IRISL's European office, and numerous IRISL vessels on its

SDN list based on evidence that the IRISL network of companies was engaged in weapons of mass

destruction proliferation activity. In the press release announcing the designation, OFAC noted

that "[n]ot only does IRISL facilitate the transport of cargo for U.N. designated proliferators, it also falsifies documents and used deceptive schemes to shroud its involvement in illicit commerce . . . . IRISL's actions are part of a broader pattern of deception and fabrication that Iran uses to advance its nuclear and missile programs." OFAC advised that "as international attention over Iran's [Weapons of Mass Destruction] programs has increased, IRISL has pursued new strategies which could afford it the potential to evade future detection of military shipments." OFAC specifically warned that "[t]hese designations also highlight the dangers of doing business with IRISL and its subsidiaries. Countries and firms, including customers, business partners, and maritime insurers doing business with IRISL, may be unwittingly helping the shipping line facilitate Iran's proliferation activities."

45. As of September 10, 2008, approximately 34 IRISL-related entities maintained accounts with the bank. The bank linked all of these customers together under one customer group number, known within the bank as an "EVD" number. On September 11, an employee in the compliance department responsible for sanctions issues emailed the head of the international legal department seeking his "advice on a big issue"—the designation of IRISL and related entities. The compliance officer noted that the IRISL network of customers at UCB AG (identified as 38 in total) all had the same engagement number (EVD) and partner number, and he asked, "How should we proceed in this case with the engagement group?" The legal department head responded, copying other legal and compliance personnel, including the head of sanctions compliance, "it is out of the question that we continue to carry out USD transactions with these companies."

46. That same day, the compliance department stopped a U.S. dollar payment on behalf of IRISL's UK branch (the IRISL entity and UCB AG customer that had just opened the Company 2 account two months before) "could not be executed" due to "Breach of NPWMD-requirements."

47.     On September 15, 2008, a sanctions compliance officer sent an email to the IRISL relationship management team, copying senior compliance and legal personnel, stating that the September 10 designation of IRISL and related entities "contains the names of companies and persons who are considered to be linked to weapons of mass destruction," and that because "this regulation has direct extraterritorial effect on us," the sanctions compliance teams had "reached the following decision: Effective immediately, USD payments may no longer be executed or accepted for the customer." He noted that the compliance and legal departments "have not issued instructions as to how to deal with the customer in the future," however, and "[c]urrently, I see the following tasks: we need a compilation of the entirety of the business at UCB AG . . . a customer history as well as profit figures." Beginning at this time, the sanctions compliance officer who authored this email and his team attempted to elevate the issue of IRISL's designation and how the bank should respond to the Management and Executive Boards of the Bank.

48.     That same day, the head of the department overseeing the IRISL business relationship sent an email in which he wrote,

> for your information, this engagement represents a gross contribution of almost 1 million Euros as of August 31, 2008. That certainly hurts and we hope that we can generally continue the very successful relationship. If the relationship were terminated, this would ultimately result in unfavorable consequences on the revenue side for 2009.

49.     Five days later, on September 20, members of the IRISL relationship team, at the behest of IRISL officials, advocated internally that Company 2 (the new IRISL UK branch entity) should be removed from the IRISL engagement group at the Bank and, thus, be exempted from the decision to discontinue U.S. dollar business on behalf of the IRISL group because the ownership structure of Company 2 did not include any IRISL officials. The sanctions compliance officer responded that "we will direct attention specifically to this problem" when they "prepare

20

the Presentation to the Management Board," and noted that, "[y]our customer will confirm this to you: Other German banks . . . with which your customer has a business relationship are much stricter than we are."  Shortly thereafter, the bank removed Company 2 from the IRISL customer group and assigned it a separate EVD number, thereby allowing Company 2 to continue to conduct business in U.S. dollars through the bank.

50.    Similarly, several days later, a member of the IRISL relationship team pleaded with another sanctions compliance officer to carry out a Euro transfer on behalf of the IRISL subsidiary Company 2 involving the UK branch of a U.S. bank because "[o]ur client unfortunately has no other bank connection to the recipient" of the payment.  The compliance officer responded, "Okay, we'll do it (with a stomach ache)".

51.    In November 2008, approximately two months after IRISL was designated as an NPWMD, the sanctions compliance officer who had issued the original advice to the business team to cease all U.S. dollar business involving entities in the IRISL customer group, sent an email to the IRISL relationship team confirming that, "[i]n a telephone conversation with [an IRISL RM] today, I was advised of the current status of the above referenced [IRISL] engagement which I would like to summarize as follows: US-Dollar credit balances were mainly converted into Euros. The US-Dollar accounts still exist, but they are kept at 'zero.'"

52.    However, UCB AG in fact continued to maintain U.S. dollar accounts (with U.S. dollar balances) for Company 1 and Company 2, and the bank continued to process U.S. dollar payments on behalf of these entities (and, by extension, IRISL) for another 18 months—nearly two years after OFAC designated IRISL an NPWMD.

*In July 2009, IRISL Officials Opened Yet More USD Accounts at UCB AG in the Name of Company 3*

53.     On July 16, 2009, an IRISL RM at UCB AG wrote an email to an individual with an "@irisl-europe.de" email address, stating, "[a]s discussed over the phone, please find attached the documents [sic] account opening documents for [Company 3]." The attached documents included a "Bank and Securities Account Power of Attorney for External Companies" form which listed IRISL's European branch (a designated SDN) as the "Attorney-In-Fact" for the account with the authority to "undertake all transactions that relate directly to the bank and securities account management" of at least one Company 3 USD account at UCB AG. Additionally, the sole "owner" of Company 3 was an Iranian citizen who was an employee and officer of IRISL. He and the two other account signatories (who also were Iranian citizens) had notations in their Iranian passports (which were submitted to UCB AG to open the Company 3 accounts) indicating that their German visas were valid only so long as they were employed by IRISL in Germany.

54.     Ten days later, the same sanctions compliance officer who earlier had raised concerns about the IRISL relationship emailed the IRISL relationship team requesting that they "please explain why numerous USD payments were booked to the account from Company 1. Due to the existing sanctions, the USD account must be closed immediately." Notably, this email is dated almost one year after the IRISL network was designated as an NPWMD.

*More Than One Year After IRISL Was Designated by OFAC, UCB AG Management Decided to Exit the Relationship, But the Bank Continued to Process USD Payments on Behalf of Known IRISL Entities for Another Year*

55.     On November 10, 2009, a member of the sanctions compliance team sent an email to the two senior reputational risk officers at the bank attaching a news article about IRISL and the transportation of weapons materials, stating, "[i]n my opinion, the customer relationship should be reviewed from a reputational point of view." On November 30, one of the reputational risk officers

wrote to the IRISL relationship manager, copying members of sanctions compliance and others, "[w]ith respect to our customer IRISL, management has decided that we cannot continue our customer relationship unless the customer can establish transparency about which good are being transported on its ships.  The reputational risk is too high for the bank."  However, the relationship was not exited at this time.

56.     About six weeks later, on January 11, 2010, the sanctions compliance team wrote to the reputational risk officers again seeking clarification: "Today, I have again some open questions which I would like to discuss with you in a meeting . . . . How do we handle the companies/participations with respect to which we know that IRISL has a substantial interest?"  According to the sanctions compliance officer who previously had raised these issues over the past year, this email was "a cry for help" from the sanctions compliance team because the bank's IRISL-related business had not ceased after the November 30, 2009 email from reputational risk.

57.     In an email (referenced above at paragraph 35), the sanctions compliance officer stated that by mid-February 2010, his team had "made various attempts in recent years to approach the Management Board of UCB AG to discontinue the Iran business.  However, it was decided to continue the business . . . ."  New customers who open accounts with us in order to handle their payments . . . are evidently welcome anytime."  This employee explained that this email was yet another attempt to elevate the IRISL issue to the Management Board.  He recalled being frustrated with management at this time because he and his team had attempted to elevate the same issue over and over again with no response, causing him concern about his team's credibility within the bank.

58.     One week later, on February 18, 2010, the head of IRISL's UK branch and Company 2—the top IRISL official based in London—sent an email to an unknown individual in

which he referred to UCB AG as "a little easygoing [sic] than others for opening the account please contact them if it is necessary I can talk with them as well." The IRISL official attached contact information for an officer in UCB AG's Hamburg branch, and the recipient of the email responded, among other things, that he knew of others who had accounts with UCB AG and that it was one bank still "working with Iran."

59.     On May 27, 2010, after an intermediary bank directed several inquiries to the bank about the connection between Company 3 and IRISL in relation to several Company 3 payments executed by UCB AG, a sanctions compliance officer wrote to an IRISL RM summarizing a phone conversation the two had had that day about Company 3.  Based on the intermediary bank's requests for information, the sanctions compliance team had reviewed the customer "more closely" and discovered that the account was opened by an Iranian citizen; that all three signatories were Iranian citizens; and that the resident permits for all three individuals note that their permits were only effective so long as they are employed by IRISL Europe.  Accordingly, the sanctions compliance officer informed the IRISL RM that U.S. dollar payments would no longer be executed by the bank on behalf of Company 3.

60.     Nonetheless, nearly one month later, on June 18, 2010, the same member of the sanctions team wrote the same IRISL RM about Company 3, "I currently have the following question for you: Even though we have given notice to the customer, the balance in the USD account has *increased* [emphasis added] by USD 5,000,000." The sanctions compliance officer explained that this email conveyed his increasing frustration with the relationship team's continued business with IRISL.  He discussed the issue with his superior, but understood that the sanctions team within compliance had no real authority to direct or discipline the relationship team.

61.     Only on July 27, 2010 did the Bank finally send Company 3 (and IRISL's European branch and other IRISL-related entities) a formal letter stating that "we are required to freeze all of your accounts until further notice."

62.     The month before, the bank had ceased handling U.S. dollar payments on behalf of Company 1 after new sanctions were imposed on IRISL and related entities by the United Nations.

63.     UCB AG stopped processing USD payments on behalf of Company 2 in July 2010 when Company 2 itself stopped sending or receiving USD payments through the bank.

64.     UCB AG exited its business relationship with IRISL entirely approximately one year later in 2011.

*Between 2006 and 2011, UCB AG Processed Approximately $320 Million in USD Payments on Behalf of IRISL and Related Entities in Violation of U.S. Sanctions.*

65.     Between 2006 and 2011, UniCredit processed U.S. dollar payments totaling approximately $320 million on behalf of IRISL or IRISL-related entities through financial institutions located in the United States in violation of U.S. sanctions.  Approximately $275.5 million occurred after IRISL was designated as an NPWMD by OFAC in September 2008 for being a proliferator of weapons of mass destruction.  All of these payments were processed without obtaining a license from OFAC in violation of IEEPA and caused false entries to be made in the business records of financial institutions located in New York, New York.

### UCB AG's Cooperation with the Government and Remediation

66.     Once presented with evidence of potential U.S. sanctions violations in 2011, UCB AG provided substantial cooperation in the government's investigation of the criminal conduct that occurred from 2002 through 2011.  UCB AG conducted an extensive and thorough internal investigation, voluntarily made U.S. and foreign-based employees available for interviews, and produced voluminous documentary materials to DOJ and to DANY.

67.     Additionally, since 2011, UCB AG has engaged in significant remediation, including the comprehensive enhancement of its U.S. economic sanctions compliance program.

## DEFENDANT'S ACCEPTANCE OF STATEMENT OF OFFENSE

I am authorized to act on behalf of UCB AG in this matter. I have read this Statement of Offense and have discussed it with counsel, David DiBari, Esquire. I am fully satisfied with the legal services provided by Mr. DiBari. I understand all of the statements included in this Statement of Offense and voluntarily agree that the statements included in the Statement of Offense are factually accurate. No threats have been made to me or UCB AG, nor am I under the influence of anything that could impede my ability to understand this Statement of Offense fully.

Date: April 14, 2019

Andreas Früh, General Counsel
Authorized Representative of UniCredit Bank AG